FILED

FEB 1 2 2004

L CLERK
US DISTRICT COURT, EDNC
BY_____ DEP. CLK



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**

JOSE SANTOS, Individually and On )
Behalf of All Others Similarly Situated, )
                                  )
            Plaintiff,         )
                                    )
            vs.              )
                                    )
                                    )
AAIPHARMA INC., PHILIP S. TABBINER, )
and WILLIAM L. GINNA, JR.,, )
                                    )
           Defendants.       )

CIVIL ACTION NO. 7'04-cv-27-Fl

**CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF**
**FEDERAL SECURITIES LAWS**

**<u>JURY TRIAL DEMANDED</u>**

       Plaintiff, Jose Santos ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the

following based upon personal knowledge as to himself and his own acts, and information and

belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

his attorneys, which included, among other things, a review of the defendants' public documents,

conference calls and announcements made by defendants, United States Securities and Exchange

Commission ("SEC") filings, wire and press releases published by and regarding aaiPharma, Inc.

("aaiPharma" or the "Company") securities analysts' reports and advisories about the Company,

and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

-1-

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the common stock of aaiPharma between July 23, 2003 and February 4, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff Jose Santos bought shares of aaiPharma during the Class Period and has suffered damages as a result of the wrongful acts of defendants as alleged herein.

-2-

7. Defendant aaiPharma is a Delaware corporation that maintains office within this judicial district at 2320 Scientific Park Drive, Wilmington, NC 28405.

8. Defendant Philip S. Tabbiner ("Tabbiner") is the Company's President and Chief Executive Officer.

9. Defendant William L. Ginna, Jr. ("Ginna") is the Company's Executive Vice President and Chief Operating Officer.

10. Defendants Tabbiner and Ginna are collectively referred to hereinafter as the "Individual Defendants." During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of aaiPharma were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

11. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors

-3-

meetings and committees thereof and via reports and other information provided to them in connection therewith.

12.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of aaiPharma, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day opera-tions of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

13.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue,

-4-

so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with aaiPharma, each of the Individual Defendants had access to the adverse undisclosed information about aaiPharma's financial condition and performance as particularized herein and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about aaiPharma and its business issued or adopted by the Company materially false and misleading.

15.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

16.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of aaiPharma common stock by

disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (1) deceived the investing public regarding aaiPharma's business, operations, management and the intrinsic value of aaiPharma's common stock; and (2) caused Plaintiff and other members of the Class to purchase aaiPharma's common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

17. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of aaiPharma between July 23, 2003 and February 4, 2004, inclusive, (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

18. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

19. Plaintiff's claims are typical of the claims of the members of the Class, because plaintiffs and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

20. Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

-6-

21.     A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

22.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

>           (a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
>           (b)     Whether Defendants breached their fiduciary duties by engaging in fraudulent activity; and
>
>           (c)     Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

### SUBSTANTIVE ALLEGATIONS

#### Background

23.     aaiPharma Inc. is a science-based specialty pharmaceutical company focused on the commercialization of branded pharmaceutical products that it develops or acquires. The Company has operations primarily in the United States and Europe.

-7-

24.     It has acquired three branded product lines since August 2001: the M.V.I. and Aquasol family of products, Brethine, and the Darvon and Darvocet family of products. In addition, it is developing its own proprietary products, as well as developing improvements and line extensions to its acquired products, by applying its scientific expertise and portfolio of proprietary and in-licensed drug-delivery technologies.

25.     The Company operates through its Pharmaceuticals Division, Research and Development Division and AA International.

### Materially False and Misleading Statements Made During the Class Period

26.     The Class Period commences on July 23, 2003. At that time, aaiPhrama reported financial results for the second quarter ended June 30, 2003. Total revenues for the second quarter were $70.8 million, representing organic growth of 15% above the $61.4 million recorded in the second quarter of 2002. For the six-month period ended June 30, 2003, revenues increased 26% to $134.8 million, compared with revenues of $107.1 million in the first half of 2002. Net income and earnings per diluted share increased 31% to $8.0 million and 33% to $0.28, respectively, as compared to the second quarter of 2002, driven by a continued shift toward higher margin pharmaceutical products. The Company reported net income of $15.1 million for the first half of 2003, or $0.53 per diluted share, an increase of 85% over income before extraordinary loss in the year ago period of $8.2 million, or $0.29 per diluted share.

27.     Commenting on theses results, defendant Tabbiner stated:

> "Our positive second quarter financial performance was driven by strong revenue growth in our pharmaceutical products division," stated Dr. Philip S. Tabbiner, President and Chief Executive Officer. **"We are very pleased with the strategic and operational milestones we achieved in the first six months of 2003 which reflect our continued focus on our core strategy of**

being a science-based, specialty pharmaceutical company."
(Emphasis added.)

28.    On July 24, 2003, the Company held a conference call with investors and

analysts.  During the conference call, the Company again reiterated its previously announced

financial results.  Commenting on the Company's current inventory levels, defendant Tabbiner

stated:

> Now looking at overall market dynamics, we continue to see
> market share gains for M.V.I.( pediatric based on our low
> aluminum benefits, the solid demand for our semi-exclusive
> Darvon( products, and increased demand for our Brethine(
> indictable brand. As a result of the steady demand for our
> brands, overall marketplace inventories across all brands are
> well within desired levels. Entering June, M.V.I.( pediatric was
> below our targeted levels, with an inventory of less than one
> week at some distributors. These inventories were replenished
> during the month of June as strong demand for this important
> product continues. According to our market research, M.V.I.(
> pediatrics' market share has moved from 33% in December
> 2002 to 72% in June 2003.
>
> Inventory levels for Darvocet (N100, our largest product,
> remains on track. We currently have less than six weeks of
> inventory in the channel for this, our high demand 100mg by
> 100 tablet pack. Inventory levels for Brethine (10 pack, our
> highest demand SKU for this brand, are below desired levels
> with less than 4 weeks of inventory in the channel. Due to
> steady increases in demand for the 10 packs versus the 100
> packs, we have discontinued the Brethine (100 pack product
> from the marketplace. Current inventory levels reflect the last
> remaining supply available for this SKU, and are in line with
> our expectations in light of the discontinuation.  (Emphasis
> added.)

29.    On August 5, 2003, aaiPharma and CIMA Labs Inc. ("CIMA") announced that

they had signed a definitive merger agreement.  Under the terms of the merger agreement, each

share of aaiPharma common stock would be exchanged for 1.0 share of the new company's

common stock. Each share of CIMA common stock would be exchanged for 1.3657 shares of the new company's common stock. At inception, aaiPharma stockholders would own 59.4 percent of the combined company and CIMA stockholders would own 40.6 percent. The transaction was structured to be tax-free to the stockholders of each company.

30.     According to the Company, the merger would create a more powerful science-based, specialty pharmaceutical company with:

> - Combined revenue and income from operations for the twelve months ended June 30, 2003 of $321 million and $83 million, respectively
>
> - Combined capitalization of $907 million, based on the August 4, 2003 closing market prices for the shares of both companies
>
> - Well-recognized pharmaceutical brands and proven, patented drug delivery technologies
>
> - Robust pipeline of near and long term proprietary products in development
>
> - Strong financial position
>
> - Leading drug development services business
>
> - Experienced pharmaceutical management team
>
> - Enhanced R&D capabilities with an expected budget of more than $30 million in 2004
>
> - Expanded manufacturing capabilities with sterile and non-sterile production, including 1 billion blister tablet manufacturing capacity in 2004, and 950 million bottle tablet manufacturing capacity expected to be operational by 2004
>
> - Dedicated pharmaceutical product marketing and field sales force of 150 professionals
>
> - Approximately 1500 employees

-10-

31.    Commenting on the merger, defendant Tabbiner stated:

"This merger creates a specialty pharmaceutical company with substantial intellectual property and R&D capabilities[.]" . . . "By combining with CIMA, we are building upon our science base by adding attractive proprietary technologies that we believe can be applied to our acquired brands to accelerate pipeline development and drive organic revenue growth. At the same time, with a strengthened balance sheet, the combined company will be well-positioned to take advantage of strategic brand acquisitions in the near term."

32.    On August 13, 2003, aaiPharma filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed its previously announced financial results. The Company also stated:

In the opinion of management, all adjustments (consisting of normal recurring adjustments) considered necessary for fair presentation have been included in these interim financial statements. Operating results for the interim periods presented are not necessarily indicative of the results that may be expected for the full year.

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes.

33.    On August 31, 2003, aaiPharma issued a press release in response to a third-party's offer to buy CIMA. More specifically, the Company confirmed that it had received notification from CIMA that CIMA has received an unsolicited proposal from Cephalon Inc., concerning its potential interest in acquiring CIMA. As previously reported, under its agreement with aaiPharma, CIMA could not enter into negotiations with a third-party concerning a proposed alternative transaction unless the CIMA board of directors concluded in good faith,

-11-

after receiving advice from its advisors and taking into account all legal, financial, regulatory and other aspects, including the likelihood of the consummation of such proposed transaction, that the proposed transaction is more favorable to the CIMA stockholders than the transaction with aaiPharma.

34.     Commenting on this, defendant Tabbiner stated:

> "We are confident that the definitive merger agreement entered into by aaiPharma and CIMA offers superior value to CIMA shareholders[.]" . . . "Our transaction will be immediately and substantially accretive to CIMA shareholders. Moreover, it will be a strategic combination that creates a more powerful science-based specialty pharmaceutical company with enhanced future growth prospects and the potential to generate significant value for shareholders for both companies over the long term."

> . . . "Our merger with CIMA will accelerate the commercialization of CIMA's proprietary pipeline and allow our combined company to leverage CIMA's proprietary orally disintegrating tablet technology with aaiPharma's brands to create future products that provide significantly higher future earnings growth potential through the substantial revenue opportunities of the combined pipeline. Because the value that our proposed stock-for-stock merger offers to CIMA stockholders is greater than what Cephalon is proposing, we do not foresee making any changes to the merger agreement in response to Cephalon's proposal."

35.     On September 11, 2003, aaiPharma issued a statement in response to CIMA's announcement of a new letter from Cephalon. The Company confirmed that it had been notified by CIMA that CIMA received a letter from Cephalon proposing to enter into discussions toward an alternative transaction. Commenting on the this, defendant Tabbiner stated: **"We believe the merger between aaiPharma and CIMA Labs will create a combined company with tremendous growth potential[.] . . . We are committed to completing the transaction with CIMA under the terms agreed upon."** (Emphasis added.)

-12-

36.     On September 19, 2003, aaiPharma issued another statement in response to CIMA's announcement of a new letter from Cephalon. This time, defendant Tabbiner stated: **"We view the merger of CIMA and aaiPharma as providing significant strategic advantages for both companies which will create substantial shareholder value[.] . . . As we have stated before, we are committed to completing the transaction with CIMA under the terms agreed upon."** (Emphasis added.)

37.     On October 22, 2003, aaiPharma announced that it had agreed to acquire a portfolio of pain management products from Elan Corporation, plc companies for $100 million, to be paid at closing. These products consist of three brands of Schedule II pain products -- Roxicodone® (oxycodone hydrochloride) tablets and oral solutions, Oramorph® SR (morphine sulfate sustained-release) tablets, and Roxanol™ (morphine sulfate) oral solutions. aaiPharma had also agreed to acquire a non-scheduled pain management product, Duraclon® (clonidine hydrochloride injection), from Elan Corporation, plc companies, as part of the same transaction. Commenting on this transaction, defendant Tabbiner stated: "These products are an excellent fit with our current sales and promotion focus and, upon completion of the transaction, will provide us added depth in the $4.5 billion moderate to severe pain category[.] . . . We look forward to discussing this **accretive transaction** in greater detail during our third quarter earnings call later this week." (Emphasis added.)

38.     Also on October 22, 2003, aaiPharma announced its financial results for the third quarter and nine month period ended September 30, 2003. Total revenues for the third quarter ended September 30, 2003 increased 16% to $71.0 million as compared to $61.2 million recorded in the comparable 2002 period. Net income for the 2003 third quarter rose 26% to $8.9

-13-

million, or $0.31 per diluted share, versus $7.1 million, or $0.25 per diluted share, for the 2002 third quarter. For the first nine months of 2003, total revenues increased 22% over the year-ago period to $205.8 million, compared with total revenues of $168.3 million in the first nine months of 2002. Net income for the 2003 nine-month period was $24.1 million, or $0.84 per diluted share, more than double the net income for the 2002 nine-month period of $10.0 million, or $0.35 per diluted share. The Company also reported cash and cash equivalents of $11.1 million at September 30, 2003, as compared to $8.1 million at June 30, 2003, after the repayment of an additional $12.5 million of debt during the third quarter of 2003. For the nine months ended September 30, 2003, the Company had repaid a total of $29.5 million of debt. In the third quarter, net cash provided by operating activities was $19.6 million and capital expenditures were $3.4 million.

39.     Commenting on these results, defendant Tabbiner stated:

> **"We are pleased with our third quarter financial results reflecting another period of strong and consistent year-over-year growth[.]"**
>
> **. . . "The recent approval and national launch of Darvocet A500™ is a significant milestone for our business. Darvocet A500™ marks the first major pharmaceutical launch undertaken by aaiPharma, and we are very pleased with the initial feedback we are receiving from physicians about the need for this lower acetaminophen alternative to the current Darvocet™ offering. Darvocet A500™, coupled with our planned acquisition of the pain portfolio from Elan, underscores our strategy to focus our efforts on the pain management category and will provide us with a complementary portfolio of products that we can leverage with our growing sales and marketing organization."** (Emphasis added.)

40.     Lastly, the Company also provided the following outlook: "Based on current trends, the Company continues to expect diluted earnings per share for 2003 to be between $1.11 and $1.17, and the net revenue range to be between $280 million and $290 million."

41.     On October 23, 2003, aaiPharma held a conference call with investors and analysts with respect to its third quarter earnings announcement. During the conference call, defendant reaffirmed their previously announced financial results. Additionally, defendant Tabbiner, with respect to inventory levels at the Company stated:

Regarding wholesale inventory levels, we continue to be very comfortable with the overall inventory levels for our products. According to the most recent IMS report and our internal tracking process, the discontinued injectable (indiscernible) 100 packs continue to be pulled from the channel, much as we expected, with approximately five months of inventory remaining in the channel.

42.     On November 14, 2003, aaiPharma filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed its previously announced financial results. The Company also stated:

> In the opinion of management, all adjustments (consisting of normal recurring adjustments) considered necessary for fair presentation have been included in these interim financial statements. Operating results for the interim periods presented are not necessarily indicative of the results that may be expected for the full year.
>
> The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes.

-15-

43.     On November 3, 2003, aaiPharma announced that its merger agreement with CIMA had been terminated, and it would continue to focus on its independent growth strategy. aaiPharma had received the $11.5 million termination fee from CIMA, as provided in the terminated merger agreement, against which merger-related expenses will be applied. Commenting on this, defendant Tabbiner stated:

> **"We are eager to refocus our full energies on pursuing our growth strategy as an independent company[.]"** . . . **"Having just reported solid performance in our third quarter, the recent approval and national launch of Darvocet A500, and the agreement to acquire a portfolio of pain products, including Roxicodone and Oramorph SR, we are confident that aaiPharma will continue its strong growth as we successfully execute our science-based specialty pharmaceutical strategy."**
>
> . . . **"Having reduced our debt by $80 million as of September 2003, we have enhanced our financial flexibility and are well positioned to expand our branded pharmaceutical products franchise, focusing more intently on the pain management marketplace. We will also continue to invest in research to drive our pipeline forward and the infrastructure needed to achieve our business goals."** (Emphasis added.)

44.     On December 2, 2003, aaiPharma announced that it had received clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 by the Federal Trade Commission for and completed the acquisition of Roxicodone®, Oramorph® SR, and Roxanol™ and Duraclon® from Elan Corporation, plc companies. Commenting on this, defendant Tabbiner stated:

> **"These products are an excellent fit with our current sales and promotion focus in pain management and allow us to expand into the moderate to severe pain market[.]"** . . . **"These products, coupled with the recent launch of Darvocet A500™, position aaiPharma for continued growth in the pain management category."** (Emphasis added.)

-16-

45.     On December 12, 2003, aaiPharma announced its financial guidance for 2004 as

follows:

> The Company believes that the financial guidance presented today
> reflects its overall strategy of combining therapeutically-relevant
> product acquisitions with its scientific expertise to drive long-term
> growth. At the time of this disclosure, the Company believes that it
> is well-positioned to achieve its financial guidance for 2004.
>
> Based upon the Company's current business performance and the
> overall outlook for 2004, aaiPharma expects net revenue for 2004
> to be in the range of $340 million to $355 million and earnings to
> be in the range of $1.45 to $1.52 per diluted share. Pharmaceutical
> products, product development and development services revenues
> for 2004 are expected to be within the following ranges:

| | 2004 Ranges (millions) |
|---|---|
| **Pharmaceutical Products** | **$234 to $245** |
| **Product Development** | **$18 to $20** |
| **Development Services** | **$88 to $90** |
| **Total Revenues** | **$340 to $355** |

> 2004 financial guidance reflects an expected continued ramp-up in
> performance for the newly introduced Darvocet A500™. Since its
> launch on October 6, 2003, scripts have trended as expected, there
> has been no degradation in Darvocet-N® 100 script volume and
> the C-IV class of pain products has grown overall.
>
> aaiPharma recently completed the acquisition of four C-II pain
> products: Oramorph® SR, Roxicodone®, Roxanol™ and
> Duraclon®. The launch and marketing promotion of these products
> are planned to begin in the first quarter of 2004. The Company has
> risk-adjusted its 2004 expectations for these products by factoring
> in the potential impact of additional generic competition for
> Roxicodone®, along with the potential benefit from enhanced
> promotion in Oramorph® SR. Inclusive of this anticipated generic
> entry, 2004 revenues for this portfolio are expected to be in the
> range of $40 million to $45 million.
>
> In addition to the potential for generic competition for
> Roxicodone®, the Company's 2004 financial guidance assumes
> that a generic formulation of its Brethine® injectable product will
> enter the market in the second half of the year.

-17-

aaiPharma anticipates 2004 gross margins as a percentage of revenues to increase modestly over those expected in 2003. Research and development spending is forecasted to increase and to be in the range of $25 million to $27 million. During 2004, selling, general and administrative expenses are projected to increase over 2003 levels and to be in the range of 28% to 30% of revenues as the Company continues to focus its promotional efforts on its growing portfolio of pain products. For the full year of 2004, the Company's tax rate is expected to be in the range of 36% to 37%. (Emphasis in original)

46.     The statements contained in ¶¶ 26-45 were each materially false and misleading because the defendants failed to disclose and indicate: (1) that the Company's core business plan was deteriorating; (2) that the Company was unloading inventory onto wholesalers in order to make sales; (3) that the aforementioned practice was necessary because the Company needed to keep its stock price up in order to fend off a third party suitor; (4) that the Company was improperly recognizing revenue, in violation of Generally Accepted Accounting Principles ("GAAP"), from sales that were not complete; and (5) as a result, the Company's financial results were materially inflated at all relevant times.

## THE TRUTH BEGINS TO EMERGE

47.     On February 5, 2004, aaiPharma announced that the Company expected net revenues to be between $340 million and $355 million for 2004. Diluted earnings per share for 2004 were expected to remain, as previously disclosed, between $1.45 and $1.52. Based on current trends, milestones achieved and other developments, the Company expected to generate earnings of $0.27 to $0.30 per diluted share during the first quarter of 2004. Additionally, the Company announced that it was setting aside money to pay for refunds on older medicines after an unusually high return rate in the fourth quarter.

-18-

48. On news of this, shares of aaiPharma fell 23 percent, or $6.36 per share to close at $21.24 per share on extremely heavy volume.

## AAIPHARMA'S VIOLATION OF GAAP RULES

49. GAAP states that "revenue should not be recognized until it is realized or realizable and earned." FASB Concepts Statement No. 5, ¶83. The conditions for the recognition of revenue are met when "persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectibility of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue." Here, aaiPharma improperly recognized revenue when revenue from such transactions was not realizable and earned, which is in violation of GAAP.

50. Given these accounting irregularities, the Company announced financial results that were in violation of GAAP, the Company's own announced revenue recognition policies, and the following principles:

(a) The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b) The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

-19-

(c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶58-59); and

(g)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated. (FASB Statement of Concepts No. 2, ¶95).

51.     The adverse information concealed by defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. 229.303).

## UNDISCLOSED ADVERSE FACTS

52.     The market for aaiPharma's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and

-20-

failures to disclose, aaiPharma's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired aaiPharma common stock relying upon the integrity of the market price of aaiPharma's common stock and market information relating to aaiPharma, and have been damaged thereby.

53. During the Class Period, defendants materially misled the investing public, thereby inflating the price of aaiPharma's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

54. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about AaiPharma's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of AaiPharma and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

-21-

## ADDITIONAL SCIENTER ALLEGATIONS

55.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding aaiPharma, their control over, and/or receipt and/or modification of aaiPharma's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning aaiPharma, participated in the fraudulent scheme alleged herein.

56.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

57.     The defendants were motivated to inflate the Company's stock price because such an act was necessary to fend off a third party suitor in the CIMA acquisition.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

58.     At all relevant times, the market for aaiPharma's common stock was an efficient market for the following reasons, among others:

-22-

(a) aaiPharma's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, aaiPharma filed periodic public reports with the SEC and the NASDAQ;

(c) aaiPharma regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) aaiPharma was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

59.     As a result of the foregoing, the market for aaiPharma's common stock promptly digested current information regarding aaiPharma from all publicly available sources and reflected such information in aaiPharma's stock price. Under these circumstances, all purchasers of aaiPharma's common stock during the Class Period suffered similar injury through their purchase of aaiPharma's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

-23-

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of aaiPharma who knew that those statements were false when made.

### FIRST CLAIM
### Violation Of Section 10(b) of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

61.     Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein. This claim is asserted against all defendants.

62.     During the Class Period, defendant aaiPharma and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: a) deceive the investing public, including plaintiff and other Class members, as alleged herein; b) artificially inflate and maintain the market price of aaiPharma's common stock; and c) cause plaintiff and other members of the Class to purchase aaiPharma's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants aaiPharma and the Individual Defendants, and each of them, took the actions set forth herein.

-24-

63.     These defendants: a) employed devices, schemes, and artifices to defraud; b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for aaiPharma's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of aaiPharma, as alleged below.

64.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's common stock would be based on truthful, complete and accurate information.

65.     aaiPharma and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of aaiPharma as specified herein.

-25-

66. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of aaiPharma's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about aaiPharma and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of aaiPharma's securities during the Class Period.

67. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; c) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

-26-

68. These defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing aaiPharma's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

69. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of aaiPharma's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of aaiPharma's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired aaiPharma common stock during the Class Period at artificially high prices and were damaged thereby.

70. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the

-27-

other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of aaiPharma, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their aaiPharma common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

71.     By virtue of the foregoing, aaiPharma and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

72.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and

sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation Of Section 20(a) Of The Exchange Act Against**
**the Individual Defendants**

73.     Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

74.     Each of the Individual Defendants acted as a controlling person of aaiPharma within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the

-28-

various statements which plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

76.     As set forth above, aaiPharma and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

-29-

(c) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 12, 2004        **MCDANIEL & ANDERSON LLP**

L. Bruce McDaniel, Esquire
Lafayette Square
4942 Windy Hill Drive
P.O. Box 58186
Raleigh, North Carolina 27658
Telephone: 919-872-3000
Fax: 919-790-9273
N.C. State Bar No. 5025
**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz, Esquire
Richard A. Maniskas, Esquire
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
(610) 667-7706

**CAULEY GELLER BOWMAN & RUDMAN, LLP**

Samuel H. Rudman
David Rosenfeld
200 Broadhollow Road, Suite 406
Melville, NY 11747
(631) 367-7100

**Attorneys for Plaintiff**

-30-